**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TRAFFIC TECH, INC., | ) | |
| | ) | Case No. 14-cv-7528 |
| Plaintiff, | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| v. | ) | |
| | ) | |
| JARED KREITER and | ) | |
| TOTAL TRANSPORTATION NETWORK, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff alleges that its former employee, Defendant Jared Kreiter, misappropriated its confidential and proprietary business information, and that Kreiter's new employer, Defendant Total Transportation Network, is now exploiting that information for its benefit. Before the Court are Defendant Total Transportation Network's motion to dismiss [82] Plaintiff's third amended complaint, Defendant Jared Kreiter's motion to dismiss [85] Plaintiff's third amended complaint, and Plaintiff's motion for a preliminary injunction [91]. For the reasons set forth below, Defendant Total Transportation Network's motion to dismiss [82] is denied, Defendant Jared Kreiter's motion to dismiss [85] is granted in part and denied in part, and Plaintiff's motion for a preliminary injunction [91] is denied. The case is set for status on 1/14/2016 at 9:00 a.m.

## I.     Background

Plaintiff Traffic Tech, Inc. is a Canadian-based company engaged in the business of transportation management, providing third-party logistics services to an international customer base. In October of 2013, Plaintiff hired Defendant Kreiter to act as the company's Vice President of Business Development. Plaintiff paid a recruiting agency $59,553 in conjunction if the hiring of Defendant Kreiter. Plaintiff also paid Defendant Kreiter a $250,000 signing bonus

as well as a salary of $20,833.34 per month plus commissions. Defendant Kreiter was a top sales employee during his time at Traffic Tech.

As part of his job duties at Traffic Tech, Defendant Kreiter was entrusted with certain confidential information concerning Plaintiff's business practices and customer relations, including sales and marketing strategies, customer information, sales data, profit-and-loss information, carrier lists, compensation information, etc. [See 80, ¶¶ 11–12.] The confidential information spanned a diverse set of business practices, including truck and intermodal transport, air and ocean freight, warehousing, and customs brokerage. [*Id.*] Much of this information was contained in a proprietary web-based Sales and Logistics System, to which Defendant Kreiter had unique access and involvement. This confidential information was not generally known in the industry. [80, ¶ 14.]

Defendant Kreiter's terms of employment were codified in a seven-page employment agreement (the "Agreement"), which contains the following provisions regarding confidential information and post-employment solicitation of business:

6.01    The Employee acknowledges that he or she will acquire information concerning the business or affairs of the Employer which are confidential and which shall always remain the property of the Employer. The Employee undertakes not to disclose or use, directly or indirectly, to the disadvantage of the Employer, for his or her benefit or the benefit of a third party, confidential information relating to the business of the Employer, including but not limited to:

a)    names of customers, clients, suppliers or agents
b)    agreements, contracts, etc. with clients, suppliers or agents
c)    programs with customers, clients, suppliers or agents
d)    pricing, rates or tariffs
e)    information relating to the financial status of the Employer
f)    any marketing or sales programs or strategies
g)    all other technical and trade information accumulated by or for the Employer.

6.02    Upon termination of Employee's employment for any reason, the Employee shall promptly return to the Employer the originals as well as

any and all copies in the Employee's possession or control, of any and all records, files, computer disks, stored computer data, other tangible or electronic media containing such Confidential Information, including all copies, and all materials belonging to the Employer as well as all other items belonging to the Employer or bearing the Employer's corporate name.

6.03    This agreement specifically allows the employee to compete with the company for business should he leave its employment. However, only accounts specified on Appendix "A" are exempt from this agreement. The employee will not solicit any existing clients of the company (except the clients notated on appendix "A") for a period of 18 months after the termination date. The employee will also not solicit any Traffic Tech account managers or employees to leave Traffic Tech for a period of 18 months after the termination date.

[80-1, at 6.] The Agreement also required Defendant Kreiter to "act with loyalty" towards Traffic Tech and "not [to] disclose any confidential information obtained in the performance, or by reason, of [his] work." [80-1, at 4.] Defendant Kreiter agreed that he "w[ould] not engage in any outside job that is in direct conflict with the essential business of [Traffic Tech], and that would result in the material and substantial disruption of [Traffic Tech's] business." [*Id.*]

Defendant Kreiter worked at Traffic Tech for less than one year, voluntarily resigning from the company on August 19, 2014. [80, ¶ 28.] Plaintiff believes that as early as June 2014, Defendant Kreiter began negotiating an employment opportunity with Defendant Total Transportation Network, a third-party logistics provider that offers shipping, tracking, and transportation-management services in direct competition with Traffic Tech. [80, ¶ 23.] Defendant Kreiter started working at Total Transportation Network in July 2015. [80, ¶ 24.]

Plaintiff alleges that in the months preceding his departure from Traffic Tech, Defendant Kreiter misappropriated Plaintiff's confidential information by emailing various documents to both to his personal email account and to Michael Sale, an owner and the registered Secretary of Defendant Total Transportation Network. [80, ¶¶ 26–27.] Plaintiff detected this activity soon after Defendant Kreiter's departure, and sent Defendant Kreiter a Cease and Desist Demand on

August 29, 2014, requesting that he sign a letter confirming that he had ceased and desisted from the alleged violations of his employment agreement. [80, ¶¶ 28–30; 80-2.] Defendant Kreiter refused to sign the demand letter. [80, ¶ 31.] On that same day, Plaintiff also sent a letter to Total Transportation Network executives (including Michael Sale), informing them of Defendant Kreiter's post-employment obligations regarding confidential information. [80, ¶ 33; 80-3.] Plaintiff filed suit against Defendant Kreiter approximately one month later, on September 26, 2014. In its recently-filed third amended complaint [80], Plaintiff alleges violations of the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq.*, as well as the common-law doctrines of breach of contract, breach of fiduciary duty, tortious interference with contract, and unjust enrichment. Defendants have moved to dismiss all claims against them. [82, 85.]

In its motion for preliminary injunction [91], Plaintiff alleges that it has lost customers and business as a result of Defendants' continuing use of its trade secrets, and that it fears that these losses will continue unless immediate action is taken. Plaintiff requests that the following injunctive measures be put into place [see 91, at 2]:

1.   that Defendants and their employees, agents, successors and assigns be enjoined from continuing to use and disclose Traffic Tech's confidential and proprietary information;

2.   that Defendant Kreiter be enjoined from engaging in continuous breaches of the Agreement by contacting, soliciting, or otherwise doing business with Traffic Tech's customers;

3.   that Defendant Total Transportation Network's employees and agents be enjoined from assisting Defendant Kreiter in his continuous breaches of the Agreement by contacting, soliciting, or otherwise doing business with Traffic Tech's customers;

4.   that Defendant Total Transportation Network and its employees be enjoined from continuing to interfere with Traffic Tech's business contracts and relationships; and

5.   any other relief that the Court deems just and equitable.

## II.     Motions to Dismiss

Both Defendants have moved to dismiss the claims against them as presented in Plaintiff's third amended complaint. [See 82, 85.]

### A.     Legal Standard

In reviewing the sufficiency of a complaint, a district court must accept all well-pled facts as true and draw all permissible inferences in favor of the plaintiff. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334 (7th Cir. 2012). The Federal Rules of Civil Procedure require only that a complaint provide the defendant with "fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Supreme Court has described this notice-pleading standard as requiring a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). While factual allegations must be accepted as true, legal conclusions may not be considered. *Id*.

### B.     Count I: Breach of Contract (Solicitation) Against Defendant Kreiter

In Count I, Plaintiff alleges that Defendant Kreiter breached the non-solicitation provision of his employment agreement with Plaintiff by soliciting at least 13 of Traffic Tech's customers within the 18-month period following his departure from Traffic Tech. Defendant Kreiter moves to dismiss this claim, arguing that (1) the non-solicitation provision in his employment agreement is unenforceable, and (2) Plaintiff has not sufficiently alleged any breach or damages. Defendant Kreiter also moves to strike several of Plaintiff's requested remedies in Count I.

### 1.     Enforceability of the Employment Agreement

The non-solicitation provision in Defendant Kreiter's employment agreement reads as follows:

> 6.03    This agreement specifically allows the employee to compete with the company for business should he leave its employment. However, only accounts specified on Appendix "A" are exempt from this agreement. The employee will not solicit any existing clients of the company (except the clients notated on appendix "A") for a period of 18 months after the termination date. The employee will also not solicit any Traffic Tech account managers or employees to leave Traffic Tech for a period of 18 months after the termination date.

[80-1, at 6.] Defendant Kreiter offers two explanations as to why this non-solicitation provision is invalid: (1) such clauses are invalid if the employee worked for the employer for less than two years, which Defendant Kreiter did, and (2) such clauses are invalid if they are unrestricted by geographic location or regarding the customers they purport to cover, which this provision is. The Court addresses each argument in turn.

### a.     Adequacy of Consideration

"It is a basic tenet of contract law that in order for a promise to be enforceable against the promisor, the promisee must have given some consideration for the promise." *Vassilkovska v. Woodfield Nissan, Inc.*, 830 N.E.2d 619, 624 (Ill. App. Ct. 2005) (citation omitted). Under the traditional rule, consideration is relatively easy to show, and courts generally look only to the existence of consideration, not its adequacy. See *Brown & Brown, Inc. v. Mudron*, 887 N.E.2d 437, 440 (Ill. App. Ct. 2008); *Wagner v. NutraSweet Co.*, 95 F.3d 527, 532 (7th Cir. 1996). But "in the context of postemployment restrictive covenants, courts depart from that rule and analyze adequacy." *Bankers Life & Cas. Co. v. Miller*, 2015 WL 515965, at *3 (N.D. Ill. Feb. 6, 2015) (citing *Mudron*, 887 N.E.2d at 440). And, in general, continued employment for a "substantial period" is needed to show adequate consideration to support an employment agreement. See, *e.g.*, *Millard Maint. Serv. Co. v. Bernero*, 566 N.E.2d 379, 384 (1990). Defendant Total

Transportation Network argues that any employment term of less than two years is categorically insufficient to support a valid non-solicitation provision. The Court disagrees.

In short, Illinois law *does not* require a strict application of the two-year rule in assessing the enforceability of a non-solicitation clause (or any similar restrictive covenant). True, some courts have held that "there must be at least two years or more of continued employment to constitute adequate consideration in support of a restrictive covenant." *Fifield v. Premier Dealer Servs., Inc.*, 993 N.E.2d 938, 943 (Ill. App. Ct. 2013); see also *Instant Tech., LLC v. Defazio*, 40 F. Supp. 3d 989 (N.D. Ill. 2014) (adopting bright-line rule). But other courts (including federal courts from this district, predicting, as they must,[1] how the Illinois Supreme Court might address the issue) have rejected a bright-line rule and instead have considered other factors in determining whether sufficient consideration was provided to enforce a restrictive covenant, such as employee compensation (including raises and bonuses) and the terms of the employee's termination. See, *e.g.*, *Montel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694, 716 (N.D. Ill. 2014) (citing cases); *Bankers Life & Cas. Co. v. Miller*, 2015 WL 515965, at *3 (N.D. Ill. Feb. 6, 2015); *LKQ Corp. v. Thrasher*, 785 F. Supp. 2d 737, 742–44 (N.D. Ill. 2011) (noting that the "substantial period" requirement "protects employees from employers who hire workers, have them sign post-employment restrictive covenants, then fire them soon thereafter," observing that those concerns "[we]re not present," and refusing to "mechanically apply a bright-line test").

---

[1] See *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Jean v. Dugan*, 20 F.3d 255, 260 (7th Cir. 1994). "In the absence of guiding decisions by the state's highest court, [federal courts] consult and follow the decisions of intermediate [state] appellate courts unless there is a convincing reason to predict [that] the state's highest court would disagree." *ADT Sec. Servs., Inc. v. Lisle–Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012); see also *AAR Aircraft & Engine Group, Inc. v. Edwards*, 272 F.3d 468, 470 (7th Cir. 2001) ("Although persuasive, the Illinois Appellate Court decisions do not bind us. When a state supreme court has not spoken on an issue, the decisions of the state's intermediate appellate courts are authoritative unless we have a compelling reason to doubt that they have stated the law correctly.").

As one court recently concluded, "[g]iven the contradictory holdings of the lower Illinois courts and the lack of a clear direction from the Illinois Supreme Court, this Court does not find it appropriate to apply a bright line rule." *Montel Aetnastak*, 998 F. Supp. 2d at 716. And in *Bankers Life*, the court noted that the last time the Illinois Supreme Court addressed post-employment restrictive covenants, the court rejected a rigid approach to determining whether a restrictive covenant's scope was "reasonable," opting instead to use a "rule of reason" analysis grounded in the totality of the circumstances. *Bankers Life*, 2015 WL 515965, at *4 (citing *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 403 (Ill. 2011) ("Each case must be determined on its own particular facts." (citation omitted))). The *Bankers Life* court "reject[ed] a rigid approach to determining whether a restrictive covenant was supported by adequate consideration," predicting that the Illinois Supreme Court would apply a more-flexible, totality-of-the-circumstances test to adequacy of consideration as it did in assessing the reasonableness of the scope of restrictive covenants. *Id.*

In addition, a recent dissenting opinion from the Illinois Appellate Court cited *Bankers Life* in rejecting the majority's application of a bright-line rule, noting that "[o]ur supreme court has never suggested that a bright-line rule applies." *McInnis v. OAG Motorcycle Ventures, Inc.*, 35 N.E.3d 1076, 1088 (Ill. App. Ct. 2015) (Ellis, J., dissenting). Justice Ellis continued in his dissent: "I agree with the majority that, under Illinois law, an employee must remain employed for a 'substantial period of time' following the signing of a restrictive covenant before a court will find that covenant supported by sufficient consideration. I just do not see why that 'substantial period of time' must be two years, and not one day less, in every single case, regardless of the circumstances." *Id.*

The Court agrees with Plaintiff (and with the opinions of *Bankers Life*, *Montel Aetnastak*, and Justice Ellis's dissenting opinion in *McInnis*) that the Illinois Supreme Court is not likely to adopt a two-year, bright-line rule in assessing whether an employee was employed for a "substantial period of time" so as to establish adequate consideration to support a post-employment restrictive covenant. With that baseline, the inquiry then becomes a fact-dependent one, based on the totality of the circumstances. For example, while Defendant Kreiter worked for Plaintiff for just over nine months, he also left voluntarily (to work for a competitor to whom he allegedly sent trade secrets) and he received a $250,000 signing bonus (equal to one year's salary). These and other factors will be considered in assessing whether Defendant Kreiter received adequate consideration so as to validate his agreement not to solicit Plaintiff's customers after leaving Traffic Tech. But because this issue turns on disputed and yet-to-be explored facts, it is not appropriate for determination at the motion-to-dismiss stage.

### b. Reasonableness in Scope

Defendant Kreiter argues that because the non-solicitation clause here lacks any geographic limitations or any limitations on the customers to which it applies, it is *per se* unreasonable. Defendant relies on Illinois appellate cases stating that "where an activity restraint, such as a covenant not to solicit, lacks *both* a geographical limitation and any qualifying language concerning the particular customers to which it applies, it is unreasonable." *Eichmann v. Nat'l Hosp. & Health Care Servs., Inc.*, 719 N.E.2d 1141, 1148 (Ill. App. Ct. 1999) ("Courts are hesitant to enforce noncompetition agreements that prohibit employees from soliciting or servicing not only customers with whom they had direct contact, but also customers they never solicited or had contact with while employed."); see also *Mudron*, 887 N.E.2d at 440 (noting that a "'post-employment restrictive covenant is generally held to be enforceable if it is reasonable in

geographic and temporal scope and it is necessary to protect a legitimate business interest of the employer'" (quoting *Abel v. Fox*, 654 N.E.2d 591, 593 (Ill. App. Ct. 1995))). Stated in this manner, the presence (or absence) of geographic and customer limitations appears to be a central (and potentially dispositive) focus of the reasonableness test.

But the Illinois Supreme Court has recently clarified the test for reasonableness, rejecting any *per se* rules in favor of a totality-of-the-circumstances analysis:

> The modern, prevailing common-law standard of reasonableness for employee agreements not to compete applies a three-pronged test. A restrictive covenant, assuming it is ancillary to a valid employment relationship, is reasonable only if the covenant: (1) is no greater than is required for the protection of a legitimate business interest of the employer–promisee; (2) does not impose undue hardship on the employee–promisor, and (3) is not injurious to the public. Further, the extent of the employer's legitimate business interest may be limited by type of activity, geographical area, and time.

*Reliable Fire*, 965 N.E.2d at 396–97 (internal citations and quotation marks omitted). While geographic limitations are still relevant in this articulation of the reasonableness test, they are only considerations that *may* impact the first of the three reasonableness factors: the Court's assessment of the employer's purported "legitimate business interest" for instituting the restrictions in the manner in which it did. Importantly, the Illinois Supreme Court dispelled the notion that any single factor can be dispositive of whether a restrictive covenant is reasonable, holding that "whether a legitimate business interest exists is based on the totality of the facts and circumstances of the individual case." *Id.* at 401–03 ("Factors to be considered in this analysis include, but are not limited to, the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions. No factor carries any more weight than any other, but rather its importance will depend on the specific facts and circumstances of the individual case.").

Based on the law as set forth by the Illinois Supreme Court in *Reliable Fire*, a non-solicitation provision's lack of geographical limitations or limitations on the customers to which it applies does not render it *per se* unreasonable. Indeed, despite these alleged shortcomings, Plaintiff argues that the non-solicitation provision is reasonable because (1) Plaintiff has a legitimate business interest in enforcing a non-solicitation clause against a former employee who acquired trade secrets and subsequently tried to use them for his own benefit, (2) the provision does not present an undue hardship to Defendant Kreiter because it expressly allows him to compete with Traffic Tech for business anywhere in the world, except for Traffic Tech's existing customers, for a period of 18 months, and (3) the clause is not injurious to the public because it does not restrain competition because it only seeks to maintain Traffic Tech's hard-earned customer base. Plaintiff also disputes Defendant's allegation that the non-solicitation lacks *any* geographical limitations or limitations on the customers to which it applies, arguing that there is no geographical limitation because Defendant Kreiter is expressly allowed to compete with Traffic Tech *anywhere in the world*, save for Traffic Tech's then-existing customer base, and because the provision only precludes solicitation of Plaintiff's *existing* customers.

But the Court need not delve into the intricacies of these arguments at this time because, as the Illinois Supreme Court stated, reasonableness "depend[s] on the specific facts and circumstances of the individual case," and the specific facts of this case have yet to be developed. *Reliable Fire*, 965 N.E.2d at 403. Because the non-solicitation clause in Defendant Kreiter's employment agreement is not categorically unreasonable as a matter of law, Defendant's arguments are insufficient to defeat Plaintiff's claim at the motion to dismiss stage.

## 2.    Whether Plaintiff Alleged a Breach and Damages

Defendant Kreiter also seeks to dismiss Plaintiff's breach of contract claim (Count I) by arguing that Plaintiff failed to sufficiently plead that he breached his employment agreement or that Plaintiff suffered damage as a result of the alleged breach. The Court disagrees.

The breach of contract claim in Count I of Plaintiff's third amended complaint relates to Defendant Kreiter's alleged breach of the non-solicitation provision in his contract, which precluded him from soliciting any of Plaintiff's clients for a period of 18 months after his termination date. Plaintiff alleges that Defendant Kreiter violated that provision by soliciting at least 13 of Plaintiff's clients, which Plaintiff names in the complaint. [80, ¶ 38.] Plaintiff claims that eight of these customers completely ceased working with Plaintiff shortly after Defendant Kreiter's departure, and that the other customers have reduced their volume of business with Plaintiff. [80, ¶ 42.] These allegations "contain sufficient factual matter, [if] accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570); see also *Wilson v. Career Educ. Corp.*, 729 F.3d 665, 676 (7th Cir. 2013) ("At the pleading stage, [a plaintiff] must simply allege a plausible breach of contract theory."). Defendant Kreiter's argument is insufficient to defeat Plaintiff's claim at the motion to dismiss stage.

## 3.    Restrictions on Defendant Kreiter's Ability to Pursue His Trade

Plaintiff requests the following forms of relief in Count I of its third amended complaint:

a.    Enter preliminary and permanent injunctive relief in favor of Traffic Tech, enjoining Defendant Kreiter from violating the Agreement by soliciting Traffic Tech customers;

b.    Create a constructive trust on the profits Defendant Kreiter has made from those customers of Traffic Tech's whom Kreiter solicited;

c.       Enter judgment in favor of Traffic Tech for damages it has suffered, including the $250,000 that Traffic Tech paid to Defendant Kreiter, and the $59,553 Traffic Tech spent in recruiting fees;

d.       Award Traffic Tech the attorneys['] fees and costs incurred in bringing this action;

e.       Enter such other relief as the Court may deem just and proper.

[80, at 9–10.] Defendant Kreiter moves to strike (at least) the relief listed in sections "b," "c," and "d," arguing that Plaintiff provided no legal authority for such "extraordinary remed[ies]." [80, at 10.] Plaintiff did not respond to Defendant Kreiter's arguments.

Under Federal Rule of Civil Procedure 12(f) "the court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike are generally disfavored but may be used to expedite a case by "remov[ing] unnecessary clutter." *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989).

Defendant Kreiter's employment agreement does not discuss the permissible remedies for breaches of that agreement, and thus the remedies available for this claim are governed by Illinois law. See *BP Amoco Chem. Co. v. Flint Hills Resources, LLC*, 2009 WL 1033373, at *5 (N.D. Ill. Apr. 17, 2009) ("[I]f a contract does not resolve precisely how to measure damages, Illinois law will fill in the gaps." (citing *Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.*, 898 F.2d 512, 517 (7th Cir. 1990))). Under Illinois law, when a contract is breached, the injured party is entitled to be placed in the position it would have been in absent the breach. *Platinum Tech., Inc. v. Fed. Ins. Co.*, 282 F.3d 927, 932 (7th Cir. 2002); *Sharon Leasing, Inc. v. Phil Terese Transp., Ltd.*, 701 N.E.2d 1150, 1156 (Ill. App. Ct. 1998); see also *Miller v. LeSea Broadcasting, Inc.*, 87 F.3d 224, 230 (7th Cir. 1996) ("[The] normal remedy for breach of contract is an award of damages."); *Wikoff v. Vanderveld*, 897 F.2d 232, 242 (7th Cir. 1990) ("[U]nder Illinois law a

party's remedy for breach of contract * * * depends on whether the breach is material or minor * * *." (citing *Circle Sec. Agency, Inc. v. Ross*, 437 N.E.2d 667, 672 (Ill. App. Ct. 1982))).

Defendant provides no authority as to why any of the requested relief is prohibited under the terms of the parties' agreement or under Illinois law. And to the contrary, regarding attorneys' fees, the employment agreement specifically says that "[i]n the event of litigation arising out of the subject matter of this agreement, the prevailing party shall be entitled to recover their reasonable attorney's fees and related costs and expenses incurred as a result of litigation." [80-1, at 5.] Similarly, while Defendant Kreiter may disagree with the amount of monetary damages that Plaintiff requests, monetary damages are the normal remedy for a breach of contract claim, see *Miller*, 87 F.3d at 230, and it is too early to say that the amount requested is "impertinent or scandalous" so as to warrant striking (or limiting) that request. Finally, while the Court agrees that Plaintiff's constructive trust request is an uncommon remedy in a breach of contract case, there is support that such claims are permitted under Illinois law. See, *e.g.*, *DeGeer v. Gillis*, 707 F. Supp. 2d 784, 796 (N.D. Ill. 2010) (constructive trust can be a remedy for breach of contract under Illinois law).

Without prejudging the merits of any of Plaintiff's requested remedies, absent any controlling authority saying that these requests are contrary to the law, the Court concludes that striking Plaintiff's requested remedies is not appropriate at this time.

### C.      Count II: Breach of Fiduciary Duty Against Defendant Kreiter

Defendant Kreiter argues that Count II of Plaintiff's third amended complaint alleging breach of fiduciary duty fails as a matter of law because (a) it is preempted by the ITSA, and (b) Plaintiff failed to allege that Defendant Kreiter owed any fiduciary duty to Plaintiff.

### 1.    Preemption under the ITSA

Regarding Defendant's preemption argument, the ITSA "is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of [Illinois] providing civil remedies for misappropriation of a trade secret." 765 ILCS 1065/8(a). However, the ITSA does not preempt contractual remedies, nor does it preempt common law claims "not based upon misappropriation of a trade secret." 765 ILCS 1065/8(b)(1)–(2). "Accordingly, when considering whether the ITSA preempts a separate claim, a court must determine whether that separate claim seek[s] recovery for wrongs beyond the mere misappropriation." *Charles Schwab & Co., Inc. v. Carter*, 2005 WL 2369815, at *4 (N.D. Ill. 2005) (internal quotations and citation omitted); see also *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404 (7th Cir. 2005).

First, portions of Plaintiff's breach of fiduciary duty claim do not relate to the misappropriation of trade secrets, and thus are not preempted by the ITSA. Specifically, Plaintiff alleges that Defendant Kreiter breached his duty not to usurp Plaintiff's business opportunities. [80, ¶ 58.] This claim is not preempted by the ITSA. *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404 (7th Cir. 2005) ("Misappropriation of a trade secret differs from other kinds of fiduciary defalcations, which the statute therefore does not affect.").

Second, regarding the portions of Count II that do relate to the misappropriation of confidential information, preemption "does not apply to duties imposed by law that are not dependent upon the existence of competitively significant information." *Hecny Transportation, Inc. v. Chu*, 430 F.3d 402, 405 (7th Cir. 2005). In other words, the relevant question is whether Defendant Kreiter's breach of fiduciary duty claim would stand even if the information that he allegedly misappropriated does not constitute trade secrets. See, *e.g.*, *Nat'l Auto Parts, Inc. v. Automart Nationwide, Inc.*, 2015 WL 5693594, at *5 (N.D. Ill. Sept. 24, 2015) (breach of

fiduciary duty claim based on the defendant's act of competing with the plaintiff was not preempted because the claim was independent of the plaintiff's misappropriation claim). Although Plaintiff begins Count II by explaining the extent to which Defendant Kreiter had access to confidential information, the substantive thrust of the claim is that while Kreiter was still working for Plaintiff, he bad-mouthed Plaintiff to Plaintiff's existing customers and tried (successfully, on many occasions) to divert their business to Defendant Total Transportation Network. [80, ¶¶ 52–57.] This claim is significantly different from Plaintiff's ITSA claim, which concerns Defendant Kreiter's alleged theft of Plaintiff's trade secrets. Plaintiff's allegations in Count II are independent of the alleged misappropriation of trade secrets, and thus Count II is not preempted by the ITSA.[2]

### 2. Stating a Claim for Breach of Fiduciary Duty

To state a claim for breach of fiduciary duty under Illinois law, a plaintiff must allege "that a fiduciary duty exists, that the fiduciary duty was breached, and that such breach proximately caused the injury of which the plaintiff complains.'" *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 782 (7th Cir. 2015) (quoting *Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000)).

Defendant Kreiter argues that "Traffic Tech has not sufficiently alleged that [he] had any fiduciary duty to Traffic Tech or [that he] committed a breach," and that "[a]t best, Traffic Tech alleges that [he] was in contact with TTN while still working for Traffic Tech." [86, at 13.]

---

[2] Plaintiff points to Section 3.03 of Defendant Kreiter's employment agreement, which says that "[t]he Employee shall act with loyalty and shall not disclose any confidential information obtained in the performance, or by reason, of the Employee's work." [80-1, at 4.] Because the ITSA does not preempt contractual remedies, 765 ILCS 1065/8(b)(1), Plaintiff's breach of fiduciary duty claim arguably could avoid preemption if fashioned as a breach of contract claim. See *Hecny*, 430 F.3d at 404 ("[The ITSA] abolishes claims *other than those based on contract arising from misappropriated trade secrets*, replacing them with claims under the Act itself." (emphasis added)). But Plaintiff does not invoke Defendant Kreiter's contractual duty of loyalty in Count II, and so the Court need not address the issue at this time.

Regarding the fiduciary duty, "[a] fiduciary relationship exists when there is a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interest of the one reposing the confidence." *Avila*, 801 F.3d at 782 (citing *Hensler v. Busey Bank*, 596 N.E.2d 1269, 1274 (Ill. 1992)). Plaintiff alleges that "[b]y virtue of being entrusted with the Traffic Tech Confidential Information, Defendant Kreiter owed Traffic Tech a fiduciary duty with respect to that information." [80, ¶ 49.] Plaintiff further alleges that "[a]s the Vice President of Business Development, * * * Defendant Kreiter had a serious responsibility to Traffic Tech not to steal * * * potential [corporate] opportunities for himself; further, he owed Traffic Tech a duty of loyalty." [80, ¶ 50.] Plaintiff also alleges that Defendant Kreiter had fiduciary duties that arose from the terms of his employment agreement. Specifically, Section 3.03 of Defendant Kreiter's employment agreement required him to "act with loyalty" and "not disclose any confidential information obtained in the performance, or by reason, of [his] work." [80 ¶ 19; 80-1, at 4.] And under Section 3.01 of the agreement, Defendant Kreiter agreed that he would "not engage in any outside job that is in direct conflict with the essential business of [Traffic Tech], and that would result in the material and substantial disruption of [Traffic Tech's] business." [80 ¶ 20; 80-1, at 4.] To be clear, Defendant Kreiter makes no arguments regarding whether the alleged fiduciary relationships are cognizable (*e.g.*, the duty not to usurp corporate opportunities); Kreiter's only argument is that Plaintiff failed to sufficiently allege the existence of a fiduciary duty. The Court disagrees. Plaintiff's complaint clearly states that Defendant Kreiter owed Traffic Tech a duty of loyalty to not disparage Traffic Tech to its customers and to not steal Traffic Tech's existing and potential-future clients and/or business opportunities. Defendant Kreiter's arguments to the contrary are unavailing.

Also unavailing is Defendant Kreiter's argument that Plaintiff failed to allege that Kreiter breached his alleged fiduciary duties. As explained above, Plaintiff alleges that while Kreiter was still working for Plaintiff, he bad-mouthed Plaintiff to Plaintiff's existing customers and attempted to steal current and potential-future clients for the benefit of Defendant Total Transportation Network. [80, ¶¶ 52–57.] Plaintiff expressly alleges that these actions amounted to breaches of Defendant Kreiter's fiduciary duties, resulting in damage to Plaintiff in the form for lost customers and lost business. [80, ¶¶ 58–59.] This is sufficient to state a breach of fiduciary duty claim.

For the sake of completeness, the Court notes that Defendant Kreiter cites to several cases for the theory that Illinois courts allow departing employees to discuss future plans with new employers. [86, at 13–14 (citing *Ellis & Marshall Assocs., Inc. v. Marshall*, 306 N.E.2d 712, 716–17 (Ill. App. Ct. 1973); *Radiac Abrasives, Inc. v. Diamond Tech., Inc.*, 532 N.E.2d 428, 434 (Ill. App. Ct. 1988)).] But these cases—both of which deal with preliminary injunctions—relate to whether the plaintiff produced sufficient evidence to show that an employee's communications with a future employer rose to the level of a breach of the employee's fiduciary duty to his current employer. Even assuming that these cases are relevant to Plaintiff's allegations, they do not have any bearing on whether Plaintiff stated a claim.

### D.      Count III: Breach of Contract (Promissory Note) against Defendant Kreiter

Defendant Kreiter argues that Count III—which is premised upon his alleged breach of a $10,000 promissory note relating to a loan that he took from Plaintiff for personal reasons—lacks the amount-in-controversy necessary to satisfy the requirements for a diversity claim, such that if the Court were to dismiss Plaintiff's other claims, it must also dismiss this claim for lack of federal jurisdiction. Because the Court has denied Defendant Kreiter's motion to dismiss

Counts I (which alleges monetary damages far in excess of the $75,000 amount-in-controversy requirement, see 28 U.S.C. § 1332), Defendant Kreiter's motion to dismiss Count III is denied.

### E.      Count IV: Illinois Trade Secrets Act Against Both Defendants

In Count IV, Plaintiff alleges that both Defendant Kreiter and Defendant Total Transportation Network violated the Illinois Trade Secrets Act, 765 ILCS 1065 *et seq.*, by misappropriating Plaintiff's trade secrets. This is the only count that Plaintiff brings against both Defendants. Both Defendants have moved to dismiss Count IV, and the Court will address those motions together.

To state a claim for misappropriate of a trade secret under the ITSA, a plaintiff must allege that (1) a trade secret existed, (2) the trade secret was misappropriated, and (3) the owner of the trade secret was damaged by the misappropriation. See *Destiny Health, Inc. v. Ct. Gen. Life Ins. Co.*, 39 N.E.3d 275, 282 (Ill. App. Ct. 2015) (citing *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 925 (Ill. App. Ct. 2005)); *Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 817 (N.D. Ill. 2014).[3] The Court reviews each element in turn.

#### 1.      Trade Secret

Regarding the first prong, a "trade secret" is any information that "(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). Examples of information that often fulfills the ITSA's secrecy requirement

---

[3] Some cases list the third element as requiring plaintiff to allege that the defendant used the trade secret in its business. See, *e.g.*, *Delta Med. Sys. v. Mid-Am. Med. Sys., Inc.*, 772 N.E.2d 768, 780 (Ill. App. Ct. 2002). But "[a]t least one Court in this district has concluded * * * that under Illinois law, 'use' is not actually a separate element, but instead, is one way to show misappropriation (the others being improper acquisition and unauthorized disclosure." *Packaging v. Hein*, 2015 WL 6164957, at *3 n.3 (N.D. Ill. Oct. 20, 2015) (citing *Pardus Holdings, Inc. v. Banner & Witcoff, Ltd.*, 585 F. Supp. 2d 995, 1004–05 (N.D. Ill. 2008)).

include "customer lists that are not readily ascertainable; pricing, distribution, and marketing plans; and sales data and market analysis information." *Mintel Intern. Group, Ltd. v. Neerghen*, 2010 WL 145786, at *11 (N.D. Ill. Jan. 12, 2010) (citations omitted); see also *Alpha Sch. Bus Co. v. Wagner*, 910 N.E.2d 1134, 1152 (Ill. App. Ct. 2009) (listing relevant factors in determining whether a trade secret exists).

The "existence of a trade secret ordinarily is a question of fact * * * best resolved by a fact finder after full presentation of evidence from each side." *Learning Curve Toys, Inc. v. Playwood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003). "At the pleading stage, plaintiffs need only describe the information and efforts to maintain the confidentiality of the information in general terms." *Scan Top Enter. Co., Ltd. v. Winplus N. Am., Inc.*, 2015 WL 4945240, at *3 (N.D. Ill. Aug. 19, 2015) (identification of trade secret as documents and data "necessary to manufacture" an end product sufficient to state a claim).[4] Even though a particular type of information *can* warrant protection as a trade secret (*e.g.*, customer lists), it is the plaintiff's burden to show that the information is "sufficiently secret" to warrant such protection, and that the plaintiff "took considerable effort, time, and resources" to create, maintain, and protect its information. *Packaging*, 2015 WL 6164957, at *3 (plaintiff failed to state a claim that its customer lists were trade secrets, for despite alleging that it took considerable time and effort to build the list, plaintiff did not allege "a single detail about how it built the customer list and, more importantly, what steps it takes to keep its customer contacts secret").

---

[4] See also *Covenant Aviation Security, LLC v. Berry*, 15 F.Supp.3d 813, 818 (N.D. Ill. 2014) (identification of trade secret as specific business information such as profit and loss information and internal costs and overhead adequate to state claim); *SBS Worldwide, Inc. v. Potts*, 2014 WL 499001, at *4 (N.D. Ill. Feb. 7, 2014) (identification of trade secret as a pricing structure combined with the defendant's pre-existing knowledge of plaintiff's charge codes "fulfills the secrecy criterion of the ITSA"); *GoHealth, LLC v. Simpson*, 2013 WL 6183024, at *12 (N.D. Ill. Nov. 26, 2013) (identification of trade secret as processes, systems, and technology that allowed call center to respond quickly adequate to state claim); *Papa John's Int'l v. Rezko*, 446 F. Supp. 2d 801, 812 (N.D. Ill. 2006) (claim allowed to proceed though "unclear which trade secrets of the 'Papa John's System' were misappropriated").

Here, Plaintiff alleges that the misappropriated trade secrets include price lists; customer names and data; names and lists of clients, suppliers, and agents; agreements; various pricing data; contracts; etc. [80, ¶¶ 12, 67.] Plaintiff further alleges that this information "is not generally known in the industry," that it gives Plaintiff "an economic advantage over its competitors," and that Plaintiff has engaged in "reasonable efforts to maintain its confidentiality." [80, ¶ 14; see also *id.* ¶ 68.] One way in which Plaintiff seeks to protect its confidential information is by limiting its employees' use of that information though confidentiality clauses in its employment agreements, such as the provision included in Defendant Kreiter's employment contract with Plaintiff. [See 80-1, at 6.] In addition, Plaintiff "endeavors to keep such information confidential and secret by * * * implementing confidentiality policies" and "limiting access to such information to key employees such as Defendant Kreiter." [80, ¶ 70.] Accepting all well-pled facts as true and drawing all permissible inferences in favor of Plaintiff, the Court concludes that Plaintiff has sufficiently alleged that a trade secret existed.

### 2. Misappropriation

Regarding the second prong, "misappropriation" can be shown in one of three ways: improper acquisition, unauthorized disclosure, or unauthorized use. 765 ILCS 1065/2(b); *Destiny Health*, 39 N.E.3d at 282; *Lumenate Techs., LP v. Integrated Data Storage, LLC*, 2013 WL 5974731, at *5 (N.D. Ill. Nov. 11, 2013) (citations omitted). Misappropriation by improper acquisition requires acquisition by improper means, which the ITSA defines as "theft, bribery, breach of inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means." 765 ILCS 1065/2(a). Misappropriation by unauthorized disclosure or unauthorized use requires a defendant to use the alleged trade secrets or disclose them to others "for purposes other than serving the interests of"

the owner of the trade secrets. *Instant Tech., LLC v. DeFazio*, 40 F. Supp. 3d 989, 1015–16 (N.D. Ill. 2014) (citing *Lumenate Techs.*, 2013 WL 5974731, at *4); see also *Destiny Health*, 39 N.E.3d at 282 ("To satisfy the use requirement, [plaintiff] must show that [defendant] could not have created its * * * program without the use of [defendant]'s trade secrets." (citing *Mangren Research & Dev. Corp. v. Nat'l Chem. Co.*, 87 F.3d 937, 944 (7th Cir. 1996))).

Regarding Defendant Kreiter, Plaintiff alleges that he misappropriated trade secrets through his repeated unauthorized disclosure of such information. [80, ¶ 74.] Specifically, Plaintiff alleges that while Defendant Kreiter still worked for Plaintiff, he sent numerous emails containing trade secrets to an employee of Defendant Total Transportation Network, removing the trade secrets from Plaintiff's servers and sending them to Defendant Total Transportation Network for its use and benefit. [80, ¶ 71–73.] This is sufficient to show, at the pleading stage, that Defendant Kreiter misappropriated the trade secrets.

Regarding Defendant Total Transportation Network, Plaintiff alleges that it misappropriated trade secrets through its improper acquisition and use of the trade secrets. [80, ¶ 76.] Plaintiff says that Defendant Total Transportation Network acquired its trade secrets through Defendant Kreiter's emails, and that Defendant Total Transportation Network knew or should have known that this information was "improperly acquired"—*i.e.*, it knew that Defendant Kreiter, who was still working for Plaintiff at the time, shouldn't have been sending trade secrets to one of Plaintiff's competitors. [See 102, at 6.] This is sufficient to show, at the pleading stage, that Defendant Total Transportation Network misappropriated trade secrets.

### 3.    Damages

Regarding the third element, which requires Plaintiff to show that the owner of the trade secret was damaged by the misappropriation, Plaintiff alleges that it "has been irreparably

damaged by Defendants' willful and wanton conduct, including loss of profits and business." [80, ¶ 81.] Plaintiff's allegation is sufficient to survive the pleading stage. For these reasons, Defendants' motions to dismiss Plaintiff's ITSA claim (Count IV) are denied. Plaintiff may proceed against both Defendants on its ITSA claim.

### F.      Count V: Tortious Interference Against Defendant TTN

In Count V of Plaintiff's third amended complaint, Plaintiff alleges that Defendant Total Transportation Network intentionally, maliciously, and wrongfully caused Defendant Kreiter to breach multiple aspects of his employment agreement with Plaintiff, thereby tortiously interfering with that contact. Defendant Total Transportation Network seeks to dismiss this claim, arguing that Plaintiff failed to state a claim upon which relief can be granted.

Tortious interference is a state law claim, governed here by Illinois law. See *Healy v. Metropolitan Pier & Exposition Auth.*, 804 F.3d 836, 841–42 & n.1 (7th Cir. 2015). To state a claim for tortious interference with a contract, a Plaintiff must plead: "(1) the existence of a contract; (2) the defendants' awareness of the contract; (3) the intentional inducement of a contract breach; (4) an actual breach of the contract; and (5) damages." *Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989)); *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 454 (7th Cir. 2012).

### 1.      Existence of a Contract

The focus of the parties' dispute relates to the first element in pleading tortious interference with contract: the existence of a contract. Defendant Total Transportation Network says that Plaintiff's tortious interference claim centers predominantly on the non-solicitation clause in Defendant Kreiter's employment agreement, which it argues is unenforceable.

As a preliminary matter, the Court notes that Defendant Total Transportation Network's argument presupposes that Plaintiff's claim only involves alleged breaches of the non-solicitation clause in Defendant Kreiter's employment contract. This is not the case. Plaintiff alleges that Defendant Total Transportation Network "caused Defendant Kreiter to breach *multiple aspects*" of his employment agreement [80, ¶ 88 (emphasis added)], not just the non-solicitation provision. Because Defendant Total Transportation Network does not argue that the contract *as a whole* is invalid, its argument can only result in a partial dismissal of Plaintiff's tortious interference claim.[5]

Regarding the non-solicitation provision, Defendant Total Transportation Network presents the same two arguments that Defendant Kreiter did as to why this provision is unenforceable: (1) such clauses are invalid if the employee worked for the employer for less than two years, and (2) such clauses are invalid if they are unrestricted by geographic location or regarding the customers they purport to cover. Because the Court already disposed of these arguments in response to Defendant Kreiter's motion to dismiss Count I, and because Defendant Total Transportation Network offers no additional insight on these arguments, the Court need not rehash that analysis here. Plaintiff has adequately alleged the existence of an enforceable non-solicitation provision.

### 2.     Defendants' Awareness of the Contract

Defendant Total Transportation Network also claims that Plaintiff failed to allege the second essential element of a tortious interference claim: that Defendants were aware of the contract. The parties agree that Defendant Total Transportation Network had knowledge of

---

[5] Defendant Kreiter's employment agreement says that "[i]f any section, paragraph, or provision (in all or in part) in this Contract is held invalid or unenforceable, this shall not, in any way, have any effect on any other section, paragraph or provision in this Contract, nor on the remaining section, paragraph or provision unless a clear indication to the contrary in the text." [80-1, at 4.]

Defendant Kreiter's employment agreement with Plaintiff as of August 29, 2014, when Plaintiff sent Total Transportation Network a copy of it. [See 80, ¶ 85; 80-3.] The issue is whether Defendant Total Transportation Network had knowledge of that contract in July 2014, when Defendant Kreiter sent Total Transportation Network 14 emails allegedly containing trade secrets (*i.e.*, at the time of the alleged interference).

Looking at the plain language of the complaint, Plaintiff alleges that "Defendant TTN had knowledge of the Agreement and its terms at all relevant times, and at the latest, August 29, 2014, when it received the TTN Notice, attaching the Agreement." [80, ¶ 85.] Plaintiff also alleges that Defendant Kreiter sent the 14 emails to Defendant Total Transportation Network from his Traffic Tech email account. [80, ¶¶ 26–27.] Plaintiff argues that one could reasonably infer from this that Defendant Total Transportation Network had knowledge of Defendant Kreiter's employment agreement based on the fact that such agreements are common in the industry and Defendant would have (or should have) known that Kreiter had such an agreement with Plaintiff.

Whether Plaintiff's allegations are true and whether its inferences are accurate have yet to be determined. But Plaintiff does not have to prove anything at the pleading stage, and his allegations, which must be accepted as true, are sufficient to show that Defendants were aware of the relevant contract at the relevant time. See *Jamsports & Entm't, LLC v. Paradama Prods., Inc.*, 2003 WL 1873563, at *14 (N.D. Ill. Apr. 15, 2003) ("Though [defendant] denies that it knew of the contract at the time of its alleged interference, that element is adequately pleaded.").

### 3. Intentional Inducement of a Contract Breach

Defendant Total Transportation Network also argues that Plaintiff failed to allege that it induced a breach of Kreiter's employment agreement. Defendant ignores Plaintiff's allegation

that "Defendant TTN unjustifiably enabled and caused Defendant Kreiter to compete with Traffic Tech, divulge Traffic Tech's Confidential Information and trade secrets, and to wrongfully convert the business opportunities of Traffic Tech to Defendant TTN's benefit," and that "Defendant TTN has intentionally, maliciously, and wrongfully caused Defendant Kreiter to breach multiple aspects of the Agreement, and has profited financially and otherwise form such breaches." [80, ¶¶ 86–87.] These allegations are sufficient to pass the pleading stage.

### 4.     Actual Breach of the Contract

Defendant Total Transportation Network also argues that Plaintiff failed to allege that a breach of Defendant Kreiter's employment agreement actually occurred. Regardless of whether Plaintiff ultimately will be able to prove that Defendant Kreiter breached his employment agreement, it adequately alleges as much. Plaintiff alleges, with considerable detail, how in July 2014 Defendant Kreiter, who was still a Traffic Tech employee, sent emails containing trade secrets from his Traffic Tech email account to Defendant Total Transportation Network (specifically, to an employee named Michael Sale), how Total Transportation Network has used that information to interfere with Traffic Tech's business relationships, and how these actions violated specific provisions within Defendant Kreiter's employment agreement. Plaintiff even attaches a letter it wrote to Defendant Kreiter on August 29, 2014 detailing these (and other) alleged breaches. [80-2, at 2–3.] These are not, as Defendant Total Transportation Network argues, "bald, conclusory assertions." Plaintiff's allegations are sufficient to pass the pleading stage.

### 5.     Damages

Plaintiff alleges that it "has been and continues to be damaged and deprived of benefits to which it is entitled" pursuant to its employment agreement with Defendant Kreiter, and that

Defendant Total Transportation Network has, as a result, "profited financially and otherwise from such breaches." [80, ¶¶ 87, 89.] Plaintiff also alleges that Defendant Total Transportation Network's conduct has interfered with its business relationships. [80, ¶ 88.] This is sufficient to plead damages.

In conclusion, Plaintiff has adequately pled its tortious interference claim, and Defendant Total Transportation Network's motion to dismiss that claim is denied.

### G.    Count VI: Unjust Enrichment Against Defendant Kreiter

Defendant Kreiter argues that Plaintiff's unjust enrichment claim should be dismissed because (a) it is preempted by the ITSA, and (2) Plaintiff cannot recover under both a breach of contract theory and an unjust enrichment theory. "In Illinois, 'to state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.'" *Clearly v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989)).

The Court agrees that Plaintiff's unjust enrichment claim is, in part, preempted by the ITSA. Unlike Plaintiff's breach of fiduciary duty claim (which the Court concluded was not preempted by the ITSA), Plaintiff's unjust enrichment claim contains allegations that overlap with Plaintiff's misappropriation claim. Specifically, Plaintiff's unjust enrichment claim is premised on Defendant Kreiter's alleged breach of his promise "to maintain Traffic Tech Confidential Information, not to solicit business away from Traffic Tech, and not to steal corporate opportunities and use them for his personal gain." [80, ¶ 91.] The first of these three claims—*i.e.*, that Defendant Kreiter breached his promise to maintain Plaintiff's confidential

information—is duplicative of Plaintiff's misappropriation claim (*i.e.*, it is dependent on the existence of confidential information), and thus is preempted by the ITSA. See *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 733 (7th Cir. 2014) (affirming the dismissal of an unjust enrichment claim as preempted by the ITSA); *Cronimet Holdings, Inc. v. Keywell Metals, LLC*, 73 F. Supp. 3d 907, 919–20 (N.D. Ill. 2014) (dismissing unjust enrichment claim as preempted by the ITSA). Plaintiff's two remaining theories for unjust enrichment—*i.e.*, that Defendant Kreiter breached his promise not to solicit business away from Traffic Tech and not to steal corporate opportunities—are not duplicative of his misappropriation claim, and thus are not preempted by the ITSA.

Defendant Kreiter's second theory for dismissal is unavailing. Even if Plaintiff cannot ultimately prevail on both a breach of contract theory and a theory of unjust enrichment, it is entitled to plead those claims in the alternative. See *Sullivan v. Alcatel–Lucent USA, Inc.*, 2013 WL 228244, at *4–5 (N.D. Ill. Jan. 22, 2013) (citing *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Comp.*, 631 F.3d 436, 448 (7th Cir. 2011); *Hefferman v. Bass*, 467 F.3d 596, 599 (7th Cir. 2006)). While Plaintiff cannot proceed on its quasi-contract unjust-enrichment claim if a contract does exist, Plaintiff clearly pleads that its unjust enrichment claim only becomes relevant "[i]n the event the Court finds that the non-solicitation and non-competition provisions of the Agreement are unenforceable." [80, ¶ 90]. *Cf. Telefonix, Inc. v. Response Eng'g, Inc.*, 2012 WL 5499437, at *5–6 (N.D. Ill. Nov. 13, 2012) (dismissing unjust enrichment and other quasicontractual claims that incorporated allegations from breach of contract claim that a contract existed, despite attempts to plead in the alternative). Plaintiff has properly pled in the alternative here.

As such, Defendant Kreiter's motion to dismiss Count VI is granted in part and denied in part. Plaintiff's claim that Defendant Kreiter was unjustly enriched because he breached his promise to maintain Plaintiff's confidential information is dismissed as preempted by the ITSA. Defendant Kreiter's motion is denied as to the remaining allegations in Plaintiff's unjust enrichment claim.

## III. Preliminary Injunction

Plaintiff seeks a preliminary injunction to preclude Defendants from misappropriating its trade secrets and soliciting its customers.

### A. Legal Standard

"A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015) (citing *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005)). The Seventh Circuit uses a two-step analysis to assess whether preliminary injunctive relief is warranted. See *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA, Inc.,* 549 F.3d 1079, 1085–86 (7th Cir. 2008). "In the first phase, the party seeking a preliminary injunction must make a threshold showing that: (1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits." *Turnell*, 796 F.3d at 661–62.

If the movement makes the required threshold showing, then the court moves on to the second stage and considers: "(4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if any, that the grant or denial of the preliminary

injunction would have on nonparties," *i.e.* the public interest. *Id.* at 662. The Court balances the potential harms on a sliding scale against the movant's likelihood of success. The greater the movant's likelihood of success, "the less strong a showing" the movant "must make that the balance of harm is in its favor." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003).

### B.    Movant's Threshold Showing

#### 1.    Irreparable Harm

In denying Plaintiff's motion for a temporary restraining order, Judge St. Eve concluded that Plaintiff failed to prove a likelihood of irreparable harm based largely on the fact that Plaintiff became aware of the alleged harm on September 26, 2014, but waited nearly a year before filing its motion for a temporary restraining order. [81, at 2]; see also *Ixmation, Inc. v. Switch Bulb Co., Inc.*, 2014 WL 5420273, at *7 (N.D. Ill. Oct. 23, 2014) ("[U]nexcused delay on the part of [the movant] is grounds for denial of a motion because 'such delay implies a lack of urgency and irreparable harm.'" (citation omitted)); *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011) ("[T]he likelihood of irreparable harm takes into account how urgent the need for equitable relief really is."). Plaintiff tried to avoid this noticeable shortcoming by producing emails that allegedly show that Defendant Kreiter is *currently* stealing customers from Plaintiff. But Judge St. Eve concluded that (a) the emails did not demonstrate that Defendant Kreiter is currently stealing customers, and (b) the emails related to the alleged violations of the non-solicitation clause, and had nothing to do with the ITSA allegations regarding the disclosure of confidential information. [81, at 3.] Plaintiff's motion was denied.

Plaintiff makes no attempt to ameliorate this shortcoming in the present motion. As expected, both Defendants responded to Plaintiff's motion by reminding the Court of Plaintiff's delay in seeking a preliminary injunction. In reply, Plaintiff rehashed its argument that because

Defendant Kreiter deleted the majority of the emails showing his allegedly illegal conduct, Plaintiff did not gain "any real knowledge" of his wrongdoings until approximately May 2015, when Defendant Total Transportation Network produced those documents to Plaintiff in response to a subpoena.

Plaintiff's argument is unavailing. First, Plaintiff's argument that it only had knowledge of Defendant Kreiter's wrongdoing in May 2015 is belied by the allegations in its complaint (which it filed eight months earlier), and also by Plaintiff's statement in its August 29, 2014 letter to Defendant Kreiter stating that "Traffic Tech has documented evidence of your attempted solicitation of multiple Traffic Tech employees, in violation of the terms of your Employment Agreement. Based on these violations of your Employment Agreement, Traffic Tech also has reason to believe that you have violated your Confidentiality and Non-Solicitation of client's [sic] provisions as well." [1-2, at 3; 80-2, at 3.]. If Plaintiff had a good-faith basis to file a complaint against Defendant Kreiter, it also should have had a good-faith basis to file an accompanying motion for a preliminary injunction. Second, even if Plaintiff did not receive "concrete evidence" of wrongdoing until May 2015, it nonetheless waited an additional three months to file its motion for a temporary restraining order, which itself is a significant delay. See, *e.g.*, *Stokley–Van Camp, Inc. v. Coca-Cola Co.*, 1987 WL 6300, at *3 (N.D. Ill. Jan. 30, 1987) (denying "extraordinary remedy" of preliminary injunction despite presumption of irreparable harm because plaintiff waited three months before filing action). This additional three-month delay is also significant (at least with respect to the non-solicitation violations) given that Plaintiff's non-solicitation limitations are slated to last for only 18 months from his termination date (August 19, 2014), and the potency of Plaintiff's irreparable-harm claim decreases as the expiration date on the non-solicitation covenant nears. Third, Plaintiff fails to

apprise the Court as to what information it learned in May 2015 that made it apparent that immediate injunctive relief is necessary (*e.g.*, some indication of a plausible ongoing or future harm), leaving the Court guessing. For these reasons, Plaintiff's justification for its delay is simply not persuasive, and thus Plaintiff is unable to demonstrate irreparable harm.

Plaintiff also argues that "[t]here is a presumption of irreparable harm to the plaintiff in cases of trade secret misappropriation," and that it should benefit from that presumption here. *Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 700 (N.D. Ill. 2004). However, "defendants may rebut this presumption by demonstrating that plaintiff will not suffer any harm if the injunction is not granted." *Id.* This plays on the requirement that the harm not only be irreparable but also immediate. See *Unite Here Health v. La Plaza Secaucus, LLC*, 2014 WL 287447, at *2 (N.D. Ill. Jan. 27, 2014) (denying a motion for preliminary injunction where the plaintiff was not in "immediate jeopardy" of the alleged harm). In other words, while the harm stemming from past violations may rightly be classified as irreparable, if those violations are not ongoing or likely to recur in the future, then there is no likelihood that the plaintiff will suffer any additional harm if the injunction is not granted.

Here, Plaintiff makes no persuasive allegations of ongoing or future harm. Plaintiff speaks obliquely about "the continuing threat of further loss," claiming that it is "impossible to determine at this time the extent to which Traffic Tech's confidential information will be stolen away by Kreiter and TTN." [92, at 12.] But by that same token, it is also impossible for the Court to assume a likelihood of ongoing or future harm without any credible evidence supporting such a claim. Thus, even if Plaintiff is entitled to a presumption of irreparable harm, Defendants adequately rebutted that presumption by demonstrating that, as evidenced by Plaintiff's own

actions and pleadings, the threatened harm is not imminent so as to justify immediate injunctive relief.

To put a finer point on it, Plaintiff essentially seeks two types of injunctive relief: (1) that related to Defendants' misappropriation of Plaintiff's trade secrets and (2) that related to Defendants' solicitation of Plaintiff's clients. As to the former, the alleged misappropriation of trade secrets occurred in July 2014, when Defendant Kreiter copied Total Transportation Network on 14 of his work emails. Even assuming that those emails contained trade secrets, and even assuming that the harm stemming from the dissemination of those trade secrets was irreparable, there is no plausible allegation as to how any information in those emails—sent approximately 17 months ago—continues to inflict irreparable harm upon Plaintiff. In a phrase, the damage is done. The information in the emails provided reflects business information (rates, lane information, etc.) that was possibly relevant in July 2014, but there is no allegation that Defendants somehow continue to farm information from these emails to exacerbate the harm that Plaintiff incurred 17 months ago. In short, there is no credible evidence of any immediate harm requiring the institution of immediate injunctive relief as to this claim.

Plaintiff's allegations relating to Defendants' solicitation of Plaintiff's clients are more plausible, but ultimately still insufficient to warrant immediate injunctive relief. The allegation is that Defendants have been stealing Plaintiff's customers despite Defendant Kreiter's contractual obligation not to do so until (at least) February 2016, when his 18-month covenant expires. Plaintiff lists 13 clients that Defendants have allegedly stolen. [See 80, ¶ 38.] Plaintiff alleges that eight of these clients stopped doing any business with Plaintiff shortly after Defendant Krieter's departure, and the remaining five clients have reduced the volume of business that they do with Plaintiff. [80, ¶ 42.] This reduction in business would have been apparent to Plaintiff in

August 2014, just after Defendant Kreiter left Traffic Tech, such that Plaintiff did not need to subpoena documents from Defendants to learn of this particular harm. And the fact that Plaintiff waited a year to file for a temporary restraining order, [see 62 (Aug. 28, 2015)], both dilutes the argument that immediate injunctive relief was (or is) necessary and supports the notion that the irreparable damage (*i.e.*, the loss of customers) is done. True, Defendants arguably re-solicit these 13 clients each time they engage in a new business transaction, but by letting Defendants continue in this manner for the remaining three months of the 18-month non-solicitation period will only mean that, if successful, Plaintiff will be entitled to an extra three months' worth of lost-profits damages. Had Plaintiff alleged a credible threat that Defendants were positioned to steal *additional* customers in this three-month window, then perhaps the "extraordinary remedy" of immediate injunctive relief would have been necessary (*i.e.*, the initial loss of a customer is more of an irreparable harm than the increase of lost-sales tally from the offender's continuing business relationship with the lost customer). See *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 806 (N.D. Ill. 2011) ("[L]ost sales can be quantifiable and remedied with an award of damages."). However, the extraordinary remedy of a preliminary injunction is not warranted to stave off a marginal increase in a harm that Plaintiff sustained for a year before seeking immediate relief. See, *e.g.*, *Preston v. Bd. of Trustees of Chi. State Univ.*, --- F. Supp. 3d ---, 2015 WL 4880917, at *7 (N.D. Ill. Aug. 14, 2015) ("Even if [plaintiff's] factual allegations were true, the court could not award her the relief she seeks because she has not identified any ongoing irreparable harm.").

### 2. No Adequate Remedy at Law

"To say that [an] injury is irreparable means that the methods of repair (remedies at law) are inadequate." *Fleet Wholesale Supply Co., Inc. v. Remington Arms Co., Inc.*, 846 F.2d 1095,

1098 (7th Cir. 1988). Certain of the alleged harms—such as the loss of trade secrets and the damage to reputation and goodwill—cannot be measured and compensated by monetary damages. See *Am. Family Mut. Ins. Co. v. Roth*, 2005 WL 3700232, at *27 (N.D. Ill. Aug. 5, 2005) ("'It is clear that the loss of trade secrets cannot be measured in money damages * * * [a] trade secret once lost is, of course, lost forever.'" (quoting *FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.*, 730 F.2d 61, 63 (2nd Cir. 1984))); see also *Menominee Rubber Co. v. Gould, Inc.*, 657 F.2d 164, 167 (7th Cir. 1981) (substantial "loss of goodwill and disruption of [plaintiff's] business * * * constitute 'irreparable harm'"). That being said, other losses, such as lost sales, can be measured and compensated by monetary damages. See *Pampered Chef*, 804 F. Supp. 2d at 806.

Here, the alleged misappropriation of Plaintiff's trade secrets (in July 2014) and Plaintiff's alleged loss of clients (in August/September 2014) are irreparable harms. However, the only plausibly-alleged current and ongoing harms—the harms that are relevant when considering immediate injunctive relief—are continuing lost sales, and Plaintiff does have an adequate remedy at law for those harms (*i.e.*, monetary damages). See, *e.g.*, *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1440 (7th Cir. 1986) ("While the difficulty in calculating future profits can often justify the finding of an irreparable injury with no adequate remedy at law, there is no *per se* rule that claims of lost profits are invariably uncalculable." (internal citation omitted)). To be clear, this temporal parsing of harms is relevant because Plaintiff seeks *immediate* injunctive relief to stop the infliction of harms for which there is no adequate remedy at law. But here, Plaintiff has not alleged that any such harms are currently occurring, or are likely to occur in the near future (namely, prior to the expiration of Plaintiff's restrictive

covenants regarding competition). Thus, for purposes of this motion, Plaintiff does have an adequate remedy at law for the plausibly-alleged current and ongoing harms.

### 3. Reasonable Likelihood of Success on the Merits

Under the sliding scale approach, a party seeking a preliminary injunction must demonstrate "that it has a 'better than negligible' chance of success on the merits of at least one of its claims." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A.*, 549 F.3d 1079, 1096 (7th Cir. 2008). As the Seventh Circuit has said, this is an "admittedly low requirement." *Id*.

Plaintiff argues that it will likely succeed both on its Illinois Trade Secrets Act claim and its breach of contract (non-solicitation) claim.

### a. Illinois Trade Secrets Act

As stated above, to state a claim for misappropriate of a trade secret under the ITSA, a plaintiff must alleged that (1) a trade secret existed, (2) the trade secret was misappropriated, and (3) the owner of the trade secret was damaged by the misappropriation. See *Destiny Health, Inc. v. Ct. Gen. Life Ins. Co.*, 39 N.E.3d 275, 282 (Ill. App. Ct. 2015) (citing *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 925 (Ill. App. Ct. 2005)). To succeed on a preliminary injunction, Plaintiff must "prove both the existence of a trade secret and the misappropriation." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995).

The main dispute here concerns whether Plaintiff has proved that the 14 emails that Defendant Kreiter sent to TTN in July 2014 actually contained any trade secrets. Again, under the ITSA, a "trade secret" is any information that "(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d).

36

Defendants say that the emails in question do not contain any trade secrets, categorizing the content of those emails as containing disparaging comments about Plaintiff, publicly-available information created by third-parties, and outdated or irrelevant information. Plaintiff disagrees, claiming that the emails contain rates and pricing structures in place for Plaintiff and its customers, as well as customer-contact information, all of which is not readily available to the public.

After reviewing Plaintiff's exhibits and Plaintiff's descriptions of those exhibits,[6] the Court concludes that Plaintiff has failed to show a reasonable likelihood of success that the information in question actually contained trade secrets. To be clear, the Court agrees with Plaintiff that customer lists, pricing information, and distribution plans are they types of documents that can be considered trade secrets under the ITSA, see *Mintel*, 2010 WL 145786, at *11, but the Court is not convinced that the exhibits provided contain such information. Specifically, while the emails identify customers (*e.g.*, Nestle, Perdue, Ace Hardware, etc.), the identification comes from reading the client's signature block, not through detailed customer lists that "took considerable effort, time, and resources" to create. *Packaging*, 2015 WL 6164957, at *3. In Plaintiff's own words, the fact that these emails came from particular customers only "put[] TTN on actual notice that these were all existing customers of Traffic Tech." [92, at 5–6.] The fact that Plaintiff did business with Nestle, Perdue, Ace Hardware, etc. itself does not constitute a trade secret. And although many of the exhibits contain technical information regarding customer "lanes," "loads," and "rates," the bulk of this information appears to be customer-generated, and does not appear to reflect any of Plaintiff's proprietary work product.

---

[6] The Court offered the parties the opportunity to present their arguments and/or to offer additional evidence in a hearing on Plaintiff's motion for preliminary injunction, but the parties "determined that they will rest on motions and papers filed." [107, at 1.]

While this information may be "confidential" under Plaintiff's definition of that term, and while Defendant Kreiter (hopefully) knew that he shouldn't have copied his competitor on client emails, Plaintiff hasn't connected the dots to identify any actual "trade secrets" within these emails, despite its burden to do so. See, *e.g.*, *GlobalTap LLC v. Elkay Mfg. Co.*, 2015 WL 94235, at *6 (N.D. Ill. Jan. 5, 2015) ("The court cannot analyze whether a piece of information was sufficiently secret to derive economic value or whether [plaintiff] took reasonable efforts to keep information secret without first knowing, with particularity, what information comprises the secret."). Plaintiff speaks only in generalities, explaining that its trade secrets "were developed through laborious prospecting," and that it "has exercised diligent and reasonable efforts to safeguard such proprietary and trade secret information," [92, at 6], but Plaintiff never singles out any particular trade secret, explaining how it created and safeguarded that particular bit of information. Instead, Plaintiff refers broadly to "[t]he various files and information emailed, copied, and/or printed by Kreiter in the month leading up to his resignation," [92, at 8], and then describes a laundry list of "trade secrets" allegedly buried within those "various" files. This falls short of the particularity required to prove the existence of a trade secret. As such, Plaintiff has failed to show a reasonable likelihood of success on its ITSA claim for purposes of this motion.

### b.     Restrictive Covenants

As was the case in Defendant Kreiter's motion to dismiss, the main issue in dispute here is whether the non-solicitation provision in his employment agreement is enforceable. Defendant offers the same two arguments as to why the provision is invalid: (1) because Defendant worked for Plaintiff for less than two years, and (2) because the clause is unrestricted regarding its geographical reach and as to the customers it purports to cover.

In the motion to dismiss context, the Court explained that while *some* Illinois appellate courts have held that "there must be at least two years or more of continued employment to constitute adequate consideration in support of a restrictive covenant," see *Fifield*, 993 N.E.2d at 943, and that "where an activity restraint, such as a covenant not to solicit, lacks *both* a geographical limitation and any qualifying language concerning the particular customers to which it applies, it is unreasonable," see *Eichmann*, 719 N.E.2d at 1148, these are not bright-line rules. Accordingly, the Court rejected Defendant Kreiter's motion to dismiss Count I, concluding that Plaintiff successfully pled around these pitfalls in its complaint. For many of these same reasons, the Court concludes that Plaintiff has a "more than negligible" likelihood of success on the merits of his breach of contract claim against Defendant Kreiter.

### i.     Adequacy of Consideration

Regarding the adequacy of consideration, Defendant Kreiter worked for Plaintiff for approximately nine months, he received a $250,000 signing bonus (equivalent to one-year's salary), and he voluntarily left the position to work for a major competitor to whom he had been sending confidential information while still employed by Plaintiff. Beginning with the signing bonus (what some courts refer to as "additional consideration"), Justice Ellis expressed skepticism about the concept of "additional consideration" as it relates to newly-hired employees in his dissenting opinion in *McInnis*:

> I also question the concept of 'additional consideration' in the context of a newly hired employee, * * * as opposed to an existing employee presented with a restrictive covenant. I do not see what, beyond employment and whatever terms accompany it, a new hire could receive as 'additional consideration.' For an *existing* employee presented with a restrictive covenant, it is not hard to imagine what consideration the employee might receive in exchange for signing the covenant: a bonus, a raise, a promotion, more vacation or sick time, etc. * * * But a new hire? When new employees are hired, they get what they get. The salary is whatever they are offered. The vacation time is whatever they are given. The job they are offered is the job they are offered. There is no such thing as a 'raise'

when the individual did not have a salary in the first place. They cannot be given
'more' vacation time when they did not have vacation time at all. They cannot be
promoted from a position they do not presently hold.

*McInnis*, 35 N.E.3d at 1092 (Ellis, J., dissenting). While the Court agrees that it would be much

easier to label "additional compensation" as consideration for a restrictive covenant for an

existing employee, this does not mean that the concept cannot exist at all with regard to new

employees, or that it cannot otherwise influence a court's totality-of-the-circumstances analysis.

True, Defendant Kreiter's employment agreement does not contain any language linking

Plaintiff's payment of the signing bonus to Defendant's acceptance of the restrictive covenants

placed upon him in that agreement [see 80-1, § 2.01], but one could argue that Defendant

Kreiter's acceptance of this signing bonus is still relevant to rebut the longstanding notion that

adequate consideration cannot exist prior to an employee's two-year anniversary. That is, even

though Defendant Kreiter only worked for Plaintiff for nine months, he received the equivalent

of 21 months' salary, including his signing bonus. This is, to be sure, a highly favorable (and

possibly undeserved) reading of these facts for Plaintiff. Ultimately though, in a totality-of-the-

circumstances regime, courts are entitled to make decisions based on the facts of each case, and

based on the allegations here, the Court is not prepared to reject the notion that Plaintiff's

$250,000 signing bonus might influence the likelihood that he received adequate consideration

for the restrictive covenants in his employment agreement.

What remains are the facts that Kreiter worked at Traffic Tech for nine months and that

he voluntarily resigned. On one hand, in *Montel Aetnastak, Inc. v. Miessen*, an employment term

of 15 months combined with a voluntary resignation was enough to show adequate

consideration. *Montel Aetnastak*, 998 F. Supp. 2d at 716. On the other hand, in *Brown & Brown,
Inc. v. Mudron*, an employment term of seven months plus voluntary resignation was not

sufficient consideration under Illinois law to support a restrictive covenant. *Brown & Brown*, 887

N.E.2d at 297 ("The fact that [plaintiff] resigned does not change our analysis."). Plaintiff, who worked for nine months, is on the wrong end of that spectrum. However, taking into consideration Kreiter's signing bonus, his resignation, and the fact that he was soliciting customers while still under Plaintiff's employ, the Court concludes that there is a more than negligible likelihood that a fact-finder could conclude that Defendant Kreiter received adequate consideration for the restrictive covenants in his employment agreement, including the non-solicitation provision.

ii.        Reasonableness in Scope

Regarding the alleged overbreadth of the non-solicitation provision, as written, the provision does not contain geographic limitations, and precludes Defendant Kreiter from soliciting any of Plaintiff's existing customers. Plaintiff disagrees with this characterization of the provision, arguing instead that it expressly allows Kreiter to compete with it *anywhere* in the world with *any* company at all, provided that the company is listed on Appendix A to Kreiter's employment agreement. The catch is that Appendix A doesn't exist—one was never created. The result is that Kreiter is not allowed to solicit any of Plaintiff's customers, regardless of location. Plaintiff argues that it was incumbent on Defendant Kreiter to populate Exhibit A, claiming that he had free reign to do so. Not surprisingly, Defendant disagrees, although he does not explain his position on who had control of Appendix A. But absent a showing that the contract provision is ambiguous—a dubious proposition—Defendant Kreiter's take on the issue is irrelevant. See, *e.g.*, *Johnstowne Centre P'ship v. Chin*, 458 N.E.2d 480, 481 (Ill. 1983) ("Extrinsic evidence may be introduced to explain the meaning of an ambiguous contract provision, but the provision is not rendered ambiguous simply because the parties do not agree on its meaning."). Incidentally, the Court is also skeptical of Plaintiff's claim that it would have allowed Defendant

Kreiter to list all of Plaintiff's existing customers on Appendix A, thereby allowing him free reign to steal them all. Regardless, the end result here is a non-solicitation provision without geographic limitation that precludes Kreiter from soliciting any of Plaintiff's existing customers.

But as the Court already explained, the Illinois Supreme Court rejected the notion that such factors are dispositive of whether a restrictive covenant is enforceable, advocating instead for a totality-of-the-circumstances analysis focused on the overall reasonableness of the provision. See *Reliable Fire*, 965 N.E.2d at 396–97. And a covenant is reasonable only if it: "(1) is no greater than is required for the protection of a legitimate business interest of the employer–promisee; (2) does not impose undue hardship on the employee–promisor, and (3) is not injurious to the public." *Id.* In considering the legitimacy of the employers interest in levying the restriction, courts consider, among other factors, "the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions," where "[n]o factor carries any more weight than any other, but rather its importance will depend on the specific facts and circumstances of the individual case." *Id.* at 401–03.

Under this standard, despite the lack of any geographic limitation, Plaintiff could still establish the reasonableness of a provision restricting Defendant Kreiter from soliciting (read: stealing) its existing customers for an 18-month period following his termination. Plaintiff points to the closeness of the relationship between its Vice President of Business Development and its clients and the fact that the Vice President of Business Development regularly accesses confidential information about its clients, such that those clients might be inclined to follow the Vice President of Business Development to a new company should he choose to leave. This covenant still allows Kreiter to compete for new business, and an 18-month restriction is

reasonable in duration. When viewed in this light, the covenant is not gratuitously or oppressively overbroad. See *Turnell*, 796 F.3d at 665–66 (concluding that a non-solicitation provision without geographic limitation that precluded competition with existing and prospective customers was overbroad, but not oppressively so, such that plaintiff had a likelihood of success on the merits).

Ultimately, while it is a close call, the Court concludes that Plaintiff has a more-than-negligible chance of succeeding on his breach of contract claim regarding the non-solicitation provision in Defendant Kreiter's employment agreement.[7]

### C. Balancing of Potential Harms

A court is required to balance the harm the non-movant will suffer if preliminary relief is granted against the irreparable harm the movant will suffer if relief is denied if it is satisfied that the moving party has demonstrated "(1) its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). As discussed above, the Court concludes that Plaintiff would not suffer irreparable harm if his request for a preliminary injunction is denied, and has an adequate remedy at law for the ongoing and potential future harms. While the Court concluded that Plaintiff does have a likelihood of success on the merits of one of his claims (*i.e.*, his breach of contract claim against Defendant Kreiter for violating the non-solicitation clause), that is not enough for Plaintiff to meet its initial burden. Therefore, it is unnecessary for the Court to balance the potential harms.

---

[7] In its motion for a preliminary injunction, Plaintiff focuses exclusively on its ITSA claim and its breach of contract claim regarding the non-solicitation provision in Defendant Kreiter's employment agreement, likely because these are the two claims that relate most closely to Plaintiff's requested relief (*i.e.*, enjoining Defendants from misappropriating its trade secrets and soliciting its customers). Because Plaintiff did not include its remaining claims in its motion, the Court will not address those claims here.

**IV.    Conclusion**

For the foregoing reasons, Defendant Total Transportation Network's motion to dismiss [82] is denied, Defendant Jared Kreiter's motion to dismiss [85] is granted in part and denied in part, and Plaintiff's motion for a preliminary injunction [91] is denied. The case is set for status on 1/14/2016 at 9:00 a.m.

Dated: December 18, 2015

Robert M. Dow, Jr.
United States District Judge